William B. Niese, OSB #081087
Edward Johnson, OSB #965737
Emily Teplin Fox, OSB #121720
bniese@oregonlawcenter.org
ejohnson@oregonlawcenter.org
efox@oregonlawcenter.org
**OREGON LAW CENTER**
455 S. 4th Street, Suite 5
PO Box 1098
Coos Bay, OR 97420
Phone: (541) 269-2616 x 202
Fax: (541) 269-1372


Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT


FOR THE DISTRICT OF OREGON


| | |
|---|---|
| **KERRY CLARK,**<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>**MICHAEL MAFFEI,** in his personal and official capacities; **RHETT DAVIS,** in his official capacity; **DENYCE SHORB; HARVEY MAFFEI,**<br><br>　　　　　　　Defendants. | Case No.:　　　16-CV-00033-JR<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**<br><br>**Pursuant to Fed. R. Civ. P. 56**<br>**Oral Argument Requested** |

i

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities...........................................................................................................iii

LR 7-1 CERTIFICATION...................................................................................................5

MOTION..............................................................................................................................5

MEMORANDUM.................................................................................................................5

STATEMENT OF RELEVANT FACTS.............................................................................6

ARGUMENT.......................................................................................................................13

I.  Summary Judgment Standard.......................................................................................13

II. The Constitutional Claims Against Chief Davis..........................................................14

    A.  Fourth Amendment Claim – *Soldal* is dispositive.......................................15

    B.  Fourteenth Amendment Claim – Procedural Due Process............................18

    C.  Chief Davis is not entitled to Qualified Immunity.......................................20

III. The Unlawful Ouster Claims......................................................................................21

    A.  Denyce Shorb and the Maffeis were all
    Landlords and/or Landlord Agents18

    B.  Shorb and the Maffeis Illegally Ousted Plaintiff from his Home..................22

    1.  Denyce Shorb...............................................................................................23

    2. Harvey Maffei...............................................................................................24

    3.  Michael Maffei..............................................................................................24

IV. Conclusion....................................................................................................................25

# TABLE OF AUTHORITIES

<u>Cases</u>

T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n
  809 F .2d 626 (9th Cir. 1987)…….............................................................................14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242  (1986)........................................................14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)……...........................................................14

Kentucky v. Graham, 473 U.S. 159 (1985)……................................................................14

Johnson v. Duffy, 588 F. 2d 740 (1978)…………….......................................................14

Ker v. California, 374 U.S. 23.(1963).................................................................................15

United States v. Jacobsen, 466 U.S. 109.(1984)……........................................................15, 17

Silverman v. United States, 365 U.S. 505 (1961)…….......................................................15

Soldal v. Cook County, 506 U.S. 56 (1992)...........................................................15, 16, 17, 18

Portman v. County of Santa Clara, 995 F .2d 898 (1993)……………...........................18

Armstrong v. Manzo, 380 U.S. 545 (1965)……………………………….................18, 19

Goldberg v. Kelly, 397 U.S. 254.(1970)…………….......................................................19

Clements v. Airport Authority of Washoe County, 69 F .3d 321
  (1995)………...........................................................................................................19

Wedges/Ledges of Cal., Inc. v. City of Phoenix
  24 F .3d 56 (1994)……………...............................................................................19

Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1972)……...........................19

Fuentes v. Shevin, 407 U.S. 67 (1972)……...................................................................19, 20

Mathews v. Eldridge, 424 U.S. 319 (1976)……...........................................................20

Harlow v. Fitzgerald, 457 U.S. 800 (1982)……………………………………….........20

Saucier v. Katz, 533 U.S. 194 (2001)……….................................................................20

<u>Statutes</u>

ORS 90.375.................................................................................................5, 6, 21, 22, 23,25

42 USC § 1983..........................................................................................................16

ORS 105.105 to 105.168..........................................................................................17, 20

U.S. Constitutional Amendment XIV.......................................................................18

ORS 90.100..............................................................................................................19, 22, 23, 24

ORS Chapter 90.......................................................................................................20

**LR 7-1 CERTIFICATION**

The undersigned counsel certifies that counsel for Plaintiffs conferred with counsel for defendants Michael Maffei and Rhett Davis, and with self-represented Harvey Maffei, over the phone but they were unable to resolve the dispute. Counsel for plaintiffs made a good faith effort to confer with defendant Denyce Shorb, who is self-represented, calling her last-known telephone number several times and sending a letter to her last-known physical address, but did not receive a timely response.

**MOTION**

Plaintiff Kerry Clark moves for summary judgment against Defendant Police Chief Rhett Davis on his Fourth and Fourteenth Amendment claims. He also moves for summary judgment on his claims against Defendants Michael Maffei, Harvey Maffei and Denyce Shorb for Unlawful Ouster under ORS 90.375.

**MEMORANDUM**

**INTRODUCTION**

This is an unlawful police-assisted lockout case. Plaintiff Kerry Clark was illegally ousted from his home in Powers, Oregon, where he planned to live, pursuant to a written rental agreement, for the rest of his life. The ouster involved an illegal and unconstitutional trespass order from the Chief of Police, followed by the physical destruction of his home by defendants Harvey and Michael Maffei.

Discovery has exposed genuine disputes of material fact on some of plaintiff's claims. This motion is for summary judgment on the claims where no such dispute exist. Accordingly, Clark moves for summary judgment against Defendant Police Chief Rhett Davis on his Fourth

Page 5 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

and Fourteenth Amendment claims.  He also moves for summary judgment on his claims against Defendants Michael Maffei, Harvey Maffei and Denyce Shorb for Unlawful Ouster under ORS 90.375.

## STATEMENT OF RELEVANT FACTS

Plaintiff Kerry Clark is a formerly homeless veteran with disabilities.  (Dec. of Kerry Clark ¶ 2.)  In April of 2016, Mr. Clark reached an agreement to move into, clean out, fix up and rent the house formerly located at 460 ½ Poplar Street in Powers, Oregon with one of the owners of that house, William Mellor.  (Clark Dec. ¶ 3 ; Dec. of Angie Armstrong ¶¶ 4-5.)  Mr. Mellor owns the property along with his sister, defendant Denyce Shorb.  (Dec. of William Niese,[1] Ex. 1 (Shorb Depo.) 6:19-22.) The property as a whole, until the events giving rise to this lawsuit, included two houses: the "main" house at 460 Poplar and the "back" house at 460 ½ Poplar. Plaintiff rented the back house.  (Ex. 1 (Shorb Depo), 15:5-16:19; Clark Dec. ¶ 4; Armstrong Dec. ¶ 4.) His agreement to rent this house was memorialized in writing in May of 2016 and states, in part, "William and Denyce hereby lease/rent property known as 460 ½ Poplar, to Kerry Clark for as long as he lives."  (Ex. 7 (Lease Agreement.))  This lease was signed by Plaintiff, Mellor, Shorb and witnessed by Angie Armstrong, Mr. Mellor's girlfriend.  (*Id.*).   Between April and June of 2016, Mr. Clark spent dozens of hours and hundreds of dollars cleaning out the house and fixing it up.  (Clark Dec. ¶ 6 ; Armstrong Dec. ¶5.) The back house had not been lived in for many years, possible since Ms. Shorb lived there herself in the 1990s, and was in bad shape when Clark agreed to rent it.  (Ex. 1 (Shorb Depo), 8:1-20; Armstrong Dec. at ¶ 5; Clark Dec. ¶ 6.)

---

[1] All exhibits cited in this brief are attached to Mr. Niese's declaration.

In June of 2016, William Mellor was jailed for an assault on Angie Armstrong. (Ex. 1, (Shorb Depo), 14: 23-25.) Around the same time, Defendant Michael Maffei, who lives next door at 470 Poplar Street and is a Powers City Councilman commonly known in Powers as "the Wizard," decided that he wanted to facilitate the purchase of the property at 460 Poplar for his brother defendant Harvey Maffei. (Ex. 2 (Michael Maffei Depo), 17:2-18:23.) The exact time that these negotiations began is unclear. Michael Maffei testified that his father was interested in the house in the summer of 2015 when he visited Oregon from Kansas (*Id.* 16:2-18.) On July 6, 2016, Denyce Shorb, with Michael Maffei's assistance, wrote a notice to the Powers Police that Angie Armstrong had left the property and "won't be allowed back" to the property. (Ex. 8, July 2016 notice.) This notice states, as of July 6, 2016, that the property was "in mid-transaction of being sold." (*Id.*) Armstrong testifies that she was unlawfully trespassed by Powers Chief of Police Rhett Davis. (Armstrong Dec. ¶ 7; Ex. 3 (Armstrong Depo), 41:6-20.)

On or about July 1, 2016, Kerry Clark tried to pay his July rent of $200 to Denyce Shorb. (Clark Dec.¶ 7; Armstrong Dec. ¶ 6.) He had an envelope with cash in it for her, but she refused to accept payment. (Clark Dec.¶ 7.) On or about July 11, 2016, Denyce Shorb called Powers Police Chief Rhett Davis and asked him to come to the property and trespass plaintiff from the home he was renting. (Ex. 1 (Shorb Depo), 20-23; Ex. (4 Davis Depo), 13:20-14:22.)

What happened next is undisputed. Chief Davis, told plaintiff that he had to leave that day or he would be arrested for trespass. Every witness to this incident besides Davis testifies that Davis was told during this incident by both Shorb and Clark that Clark was living there pursuant to a written rental agreement. (McEldowney Dec., ¶¶ 2-7; St. Louis Dec., ¶¶ 2-7; Clark Dec.¶¶ 8-9.) Defendant Denyce Shorb testified as follows at her deposition:

> Q. So you asked Officer Davis to trespass Kerry Clark?
> A. Yes.

Page 7 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

Q. And Officer Davis responded and asked Mr. Clark to leave.

A. Yes.

Q. Did you have a court order at that time?

A. No.

Q. Had you filed an eviction notice at that time?

A. No.

Q. Did Mr. Clark leave?

A. No.

Q. Did you have to call Officer Davis again after that?

A. No.

Q. Do you know if Officer Davis came back to the property after this initial interaction?

A. I had heard that he did, but I didn't – I wasn't there personally.

Q. Who did you hear from that he had been back out there?

A. Mr. Maffiea -- Michael.

(Ex. 1, (Shorb Depo), 20:25-21:21.)

Q. So you were physically present when Officer Davis came out to the property?

A. Yes.

Q. Who else was there besides you, Mr. Clark and Officer Davis?

A. He had some other people inside the residence.

Q. Do you know how many?

A. Three.

Q. And do you know who those people were?

A. No.

Q. Was one of them Tiffany?

A. No.

Q. And did Officer Davis say anything to those people?

A. Just that they had to leave also.

Q. Did you tell Officer Davis that you had a rental agreement with Mr. Clark?

A. Yes.

Q. Did you show him that rental agreement?

A. Yes.

(Ex. 1, (Shorb Depo), 22:8 – 23:2.)

Shorb went on to testify that when she showed Chief Davis plaintiff's rental agreement, she explained that he hadn't paid her rent and that Davis, knowing that plaintiff was a tenant, went to the back house with her, told plaintiff and his guests they had to leave and "threatened to get him for trespass." (Ex. 1, (Shorb Depo), 59-62.) Following Chief Davis' order to leave and

Page 8 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDOM OF LAW IN SUPPORT**

threat of trespass, Denyce Shorb told plaintiff, in Davis' presence, that Clark could stay for a short period to get his van fixed and to get his things out. (Ex. 1, (Shorb Depo), 20:14-24.) Chief Davis admits that he trespassed Clark and his guests. (Ex. 4, (Davis Depo), 13-14.) In his deposition, he initially implausibly testified that he "didn't know that [Clark] was living there. He never told me he was living there." (Ex. 4, (Davis Depo), 14:7-9.) All of the other people present testify that Clark and Shorb both told Davis that Clark was living there pursuant to a written rental agreement. (Clark Dec.¶ 9; Ex. 1, (Shorb Depo), 20:3-23:2; 76:25-78:7; St. Louis Dec. at ¶¶ 4-7; McEldowney Dec. at ¶¶ 4-7.) In fact, Davis, later in his deposition admits that he knew Clark was living there as well because he heard Shorb tell Clark that he could stay there for a while longer until his van was working. (Ex. 4 (Davis Depo), 44:16-46:5.) He understood that Clark would, at a minimum, be staying the night at 460 ½ Poplar. (*Id*. at 15:1-6; 46:2-5.) Denyce Shorb testified unequivocally that she told Chief Davis that Mr. Clark was living there, that he had a rental agreement, that he hadn't paid his rent and that he wasn't taking out his garbage. (Ex. 1, (Shorb Depo), 59:6-13; 22:23 – 23:2.)

This order to leave and threat of trespass threw plaintiff's life into turmoil. (Clark Dec.¶ 11.) He began trying to move his personal possessions to the safety of multiple friends' homes. (*Id.*) When he returned to the property on and off over the next two months, he was constantly worried that he would be arrested. (*Id.*) He often lived there for stretches of time in July, August and September of 2016 despite that risk, because he had no place else to go and he did not want to relinquish his lifetime lease. (Clark Dec. ¶ 12.) Chief Davis never retracted his order and threat and on multiple other occasions told plaintiff that he had to leave and couldn't stay at 460 ½ Poplar. (*Id.*)

Meanwhile Michael Maffei was getting impatient that plaintiff kept coming back to the property that he wanted his brother to buy.  Councilman Maffei knew that Kerry Clark had a lifetime lease to rent the "back" house.  (Ex. 2, (M.Maffei Depo), 13:19-22, 33:10.)  Councilman Maffei contacted Chief Davis repeatedly to enlist his help in getting rid of Angie Armstrong and her guests from the "main" house and then in getting rid of Kerry Clark and his guests from the back house. Michael Maffei's phone records show 13 calls between Councilman Maffei and Chief Davis or his Deputy Mitchell Allen just before the illegal lockout between July 1 and July 10, 2016.  (Ex. 10, Verizon Phone Records.) Most of these contacts were made by cell phone, (*Id.*) but on at least one occasion Councilman Maffei spoke to Chief Davis at City Hall in Powers about the status of Kerry's exclusion. (Ex. 2, (M.Maffei Depo), 39:13-40:6.)  The Mayor of Powers was also enlisted to contact Davis about the status of removing Kerry Clark from his home.  (Ex. 4, (Davis Depo), 27:6-15.)  Michael Maffei used his position as a city councilor to facilitate the ouster of Mr. Clark from his home.

By mid-July of 2016, Michael Maffei's brother Harvey had moved into the main house at 460 Poplar. (Ex. 2, (M.Maffei Depo), 20:5-21:21.)  Councilman Maffei was, at this point, actively negotiating on behalf of his brother to purchase the property.  (Ex. 2, (M.Maffei Depo), 23:7-22.)  He knew that his brother wanted to tear down the back house, where plaintiff lived, at 460 ½ Poplar and build a storage tower for his used car collection (E. 2, (M.Maffei Depo), 23:10-12.)  Councilman Maffei repeatedly asked plaintiff to leave.  (Clark Dec. ¶ 14.) Denyce Shorb witnessed the Maffei brothers asking plaintiff to leave.  (Ex. 1, (Shorb Depo), 27:19-28:1.) Michael Maffei testified at his deposition that he expected Chief Davis to trespass him and then started theorizing about Mr. Clark's rental agreement before his lawyer cut him off:

Q. Did you expect Officer Davis to do something to facilitate Mr. Clark leaving that property?

Page 10 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

A. There was a point where you almost have to, because the understanding is the man's supposed to be gone.

Q. And what's that understanding based upon?

A. Well, by the time that I started expecting it is when this is such a stale thing here. You're looking at "tenant must vacate within 72 hours." He signed it, they signed it. Of course, interestingly enough, there isn't a date anywhere on this thing. You know, any legal agreement is always dated by every signature and is dated at the top. This isn't dated anywhere.

MR. WARREN: Let's take a short break. I'll get you some water, too.

THE WITNESS: I find that curious.

MR. WARREN: Just don't talk until you have a question.

(Ex. 1, (M. Maffei Depo), 36:9-37:1.)

On August 3rd, Denyce Shorb and Harvey Maffei entered into a sales contract for Harvey Maffei to purchase the property at 460 Poplar. (Ex. 11, (Sales Agreement.)) The August 3rd Sales Agreement, which was obtained by Michael Maffei, authorizes Defendant Harvey Maffei, in his brother's handwriting to remove "all persons and personal property of said persons" from the premises at his discretion. (Ex. 11, (Sales Agreement), 6.) Michael Maffei acted as the seller Denyce Shorb's witness to that contract. (*Id.*, p. 5.) That deal never closed, but Harvey Maffei lived in the main house from July of 2016 until March or April of 2017. (Ex. 5, (H.Maffei Depo), 20:20-21:2; Ex. 2, (M.Maffei Depo), 23:21-24:6; 28:25-29:1.) Throughout August of 2016 both Michael Maffei and Harvey Maffei pressured plaintiff to leave sometimes using threats of physical force. (Clark Dec.¶14.) On August 23, 2016, Michael and Harvey Maffei posted a document titled "evection [sic] notice" on plaintiff's house. (Ex. 2, (M.Maffei Depo), 42:7-24; Ex. 12, (Eviction Notice.) This notice, signed by Shorb, states, "I, here by give this evection [sic] notice to Kerry Clark of 460 ½ Poplar St. Powers, OR 97466 to vacate the premises in 72 hours. Date: August 26, 2016, Time 1:00 p.m." No eviction action was ever filed

in court based upon this notice, which is flawed in many regards, including not stating how much rent is owed. (*Id.*)

On August 26, 2016, Shorb signed another document that states, "I, Denyce Shorb give Harvey Maffei permission to tear down structures and dispose of everything in buildings and on property (460 Poplar Street Powers OR)." (Ex. 11, (Sales Agreement), 6.) It is not clear whether the destruction of Kerry Clark's house had begun before this "permission" document was signed, but if it had not, it began at this time. Harvey and Michael Maffei began to tear down plaintiff's home, knowing that he had a rental agreement that had not been terminated by court order and knowing that plaintiff was still living there and still had his belongings in the house. (Clark Dec. ¶16; Ex. 1, (Shorb Depo), 72-75.) Angie Armstrong witnessed Shorb and the Maffei brothers tearing down Mr. Clark's home. (Armstrong Dec. at ¶ 9.) Trisina Vinson witnessed both of the Maffei brothers tearing down Mr. Clark's home. (Ex. 6, (Vinson Depo), 15:8-11.) Michael Maffei testified that he told his brother to tear the house down "a piece at a time" so that Mr. Clark could get the idea and get his things out. (Ex. 2, (M.Maffei Depo), 47:3-50:24.) He also testified that he could see plaintiff's things, including a Bible, still in the house. (Ex. 2, (M.Maffei Depo), 50:15-24.) Harvey Maffei testified that Mr. Clark still had personal belongings in the house when he tore it down including dishes, a couch and an entertainment center. (Ex. 5, (H.Maffei Depo), 24:21-25:1.)

Plaintiff tried to stay in the house after the demolition began. (Clark Dec. ¶17.) He called Chief Davis and the Coos County Sheriff to report the destruction of his home. (Clark Dec. ¶17.) Officer Davis recalls seeing the house half destroyed and that Mr. Clark had put blankets up because the Maffeis had torn plaintiff's door off. (Ex. 4, (Davis Depo), 37:19-24.) Chief Davis testified:

Q. Do you remember him ever telling you that Michael and Harvey Maffei had damaged his house, physically damaged his house?

A. If he did, I would have told him the same thing I told everybody else: Civil. Take it to civil court. It's a landlord/tenant issue. Same thing I told Sylvia, she would have to go down to the courthouse and do it. Same thing -- I have people in the trailer parks do that every month. They want me to evict somebody. I'm not the landlord police.

(Ex. 4, (Davis Depo), 38:8-17.)  A few moments later, Davis contradicted himself about whether

Michael and Harvey Maffei tearing down Clark's house would really be a civil matter,

Q. If a next door neighbor comes over to the house next door to them and tears the front door off, that could be a criminal investigation. Am I correct about that?

A. Yes.

Q. Was there any investigation into why Kerry's house was being damaged?

MR. WARREN: Object to the form of the question. Go ahead. Your answer?

THE WITNESS: I'm sorry, say that again.

BY MR. JOHNSON: (Continuing)

Q. Was there any kind of investigation into why the house that Kerry was living in was being physically damaged?

A. I inquired as to why there -- I could see damage. This was later. And then Maffei and Shorb said that they had agreed on some kind of a purchase and that she told them to tear it down. Shorb.

(Ex. 4, (Davis Depo),39:11 – 40:4.)  Police Chief Davis was willing to trespass plaintiff without

a court order, but would not assist Kerry Clark when his house was being torn down by

Councilman Maffei and his brother with the landlord's permission.

At some point in September 2017, his home partially destroyed by Michael and Harvey

Maffei, plaintiff left Powers for good, became homeless and lived outside for several months.

(Clark Dec.¶19.)


Page 13 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

## ARGUMENT

### I.  Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts, which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.,* 809 F.2d at 630.

### II. The Constitutional Claims Against Chief Davis

"[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under the color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original). This causal connection can be established by "some kind of direct personal participation" or "setting in motion a series of acts

Page 14 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

by others . . . to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).

Chief Davis' liability here is straightforward.  He directly participated by unlawfully trespassing plaintiff from his home and set in motion the actions of other defendants by putting the stamp of state authority on this unlawful lockout.  Chief Davis' direct action of ordering plaintiff to leave his home under threat of arrest for trespass violated two well-established rights of plaintiff – his right to be free from unlawful seizure of his home under the Fourth Amendment and his right to the procedural protection of an eviction action and court order under the Fourteenth Amendment.

Chief Davis directly caused plaintiff's constitutional deprivation, by unlawfully initiating his trespass.  Further, Chief Davis' unlawful acts emboldened Shorb and the Maffeis to unlawfully exclude plaintiff from his home and to physically destroy the house that he planned to live in for the rest of his life.

## A.  Fourth Amendment Claim – *Soldal* is dispositive.

The Fourth Amendment, made applicable to the States by the Fourteenth, *Ker v. California*, 374 U.S. 23, 30 (1963), provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, (1984). In addition, "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." *Silverman v. United States*, 365 U.S. 505, 511 (1961).

Page 15 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

It is well established that a police officer's active involvement in a landlord's attempt to illegally trespass a tenant violates the Fourth Amendment.  *Soldal v. Cook County*, 506 U.S. 56 (1992), is dispositive here.  If anything, the actions of Chief Davis in this case are more egregious than that of the officers in *Soldal*.  The undisputed facts of this case fall squarely within the four corners of this Supreme Court precedent.

In *Soldal,* a mobile home park owner, having once sued unsuccessfully in an Illinois trial court to evict a tenant, filed a second eviction proceeding claiming nonpayment of rent by the tenant.  *Id* at 58.  Prior to the hearing in the second proceeding, the park manager notified the county sheriff's department that she was going to remove the tenant's trailer home from the park, and requested the presence of deputy sheriffs to forestall any resistance.  *Id.*  Up to five deputy sheriffs were present as park employees disconnected the home's sewer and water connections and towed it out of the park, which caused serious damage to the home. *Id.*  The deputies informed the tenant that they were there to prevent him from interfering, and, when he sought to file a complaint for criminal trespass, referred him to a deputy lieutenant who had remained in the manager's office.  *Id.*  After talking to a prosecuting attorney, the lieutenant declined to accept the complaint on the ground that the matter was between the tenant and the park owner. *Id.* Throughout this period, the deputies were aware that the owner did not have an eviction order and that the eviction was unlawful.  *Id.* at 59.  A few days later, a state court ruled that the eviction had been unauthorized and ordered the park owner to return the tenant's trailer home to the park.  *Id.*  The tenant subsequently filed an action under 42 USC § 1983 in a Federal District Court against the park owner and manager and the deputies, alleging that these defendants had violated the tenant's rights under the Federal Constitution's Fourth and Fourteenth Amendments by conspiring to unreasonably seize and remove the home.  The District Court granted summary

Page 16 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

judgment in favor of the defendants, on the ground that the tenant had failed to adduce any

evidence to support a conspiracy theory and thus to show the existence of state action required

under § 1983.  *Id.*  The United States Court of Appeals for the Seventh Circuit, affirming in part

and reversing in part, held that (1) there was state action, but (2) the removal of the home did not

constitute a "seizure" for purposes of the Fourth Amendment.  *Id.* at 60.

> The Supreme Court reversed. In a unanimous opinion, the Court held,

> "We do not agree with this interpretation of the Fourth Amendment. The
> Amendment protects the people from unreasonable searches and seizures of 'their
> persons, houses, papers, and effects.' This language surely cuts against the novel
> holding below, and our cases unmistakably hold that the Amendment protects
> property as well as privacy. This much was made clear in *Jacobsen*, *supra*, where
> we explained that the first Clause of the Fourth Amendment 'protects two types of
> expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when
> an expectation of privacy that society is prepared to consider reasonable is
> infringed. A 'seizure' of property occurs where there is some meaningful
> interference with an individual's possessory interests in that property.'"

*Id* at 62-63, citing *Jacobson* 466 U.S. at 113.

As in Illinois, under Oregon law, a residential tenant can only be dispossessed of their

home pursuant to a court eviction order. ORS 105.105 to 105.168.  In this case, defendant

Denyce Shorb, on July 11, 2016, without giving an eviction notice and without filing an eviction

action, called Chief Davis and asked him to trespass plaintiff from the home that he was renting

pursuant to a lifetime rental agreement.  Chief Davis did just that.

In *Soldal,* the Sheriff stood-by for the landlord, but wouldn't take a trespass complaint

from tenant saying that it was a "landlord-tenant matter." Chief Davis' involvement was more

direct and affirmative.  He went to plaintiff's home, barged in the front door without knocking

and ordered him to leave under threat of arrest.  Later, similar to *Soldal*, when plaintiff

complained to Chief Davis about his house being destroyed and his property taken, plaintiff was told by Chief Davis that it was a "civil matter."  (Ex. 4, (Davis Depo), 38:8-17.)

*Soldal* is clear that the unconstitutional seizure took place at the time the mobile home was moved off the property, even though it was shortly moved back on.  *Soldal* at 61-62.  Here the unconstitutional seizure took place at the time that plaintiff was ordered to leave under threat of arrest.  While Defendant Shorb agreed to let plaintiff stay to get his things out, Chief Davis never revoked his order to leave and, in fact, reiterated it on multiple occasions.  (Clark Dec., ¶ 12.)  *Soldal* makes clear that Chief Davis' conduct violated Mr. Clark's Fourth Amendment right.

**B.  Fourteenth Amendment Claim – Procedural Due Process**

Clark's clearly established right to a valid eviction notice and an opportunity to be heard through the civil eviction process was violated when Chief Davis unilaterally ordered him to leave his home without notice and without a court order.

The Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  A Section 1983 claim based upon the deprivation of procedural due process has three elements: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

At its core, the due process clause requires that a person be provided with proper notice and afforded a meaningful opportunity to be heard before a state actor deprives them of a property interest.  "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of

Page 18 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

life, liberty or property be preceded by notice and the opportunity for hearing appropriate to the nature of the case." *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (quoting *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313 (1950)).  "The fundamental requisite of due process of law is the opportunity to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)); *Clements v. Airport Authority if Washoe County*, 69 F.3d 321, 332 (9th Cir.1995).  With regard to residential evictions in Oregon, these fundamental aspects of due process are embodied in the Oregon Residential Landlord Tenant Act (ORLTA) that requires notice, a court hearing, and a court order before a tenant can be forcibly removed from their home.  ORS 90.100 et seq.; ORS105.105 et seq.

A threshold requirement of procedural due process is a constitutionally protected property interest. *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir.1994). The U.S. Supreme Court has stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

Plaintiff lost his home when defendant Davis ordered them to leave under threat of arrest. Pursuant to a written lease, plaintiff had a reasonable expectation that he would be able to live in this home for the rest of his life.  (Ex. 7, (Lease Agreement.)) A person's possessory property interest in the continued occupancy of their home is fundamental to daily life.  It is well settled that possessory interests in property invoke procedural due process protections.  *Fuentes v. Shevin,* 407 U.S. 67, 85 (1972).

Page 19 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

Plaintiff's specific property interests have their roots in, among other sources, the ORLTA and Oregon's Forcible Entry and Detainer statutes, which specify the notice a tenant gets and requires a trial and a court order before a tenant is removed from his or her home. ORS Chapter 90; ORS 105.105 et seq. Davis deprived plaintiff of his property by unlawfully ordering him to leave his home without prior notice and an opportunity to be heard.

In addition to the plaintiff's statutory rights under Oregon law, plaintiff had clearly established and long recognized constitutional rights to notice and a hearing prior to having the possessory interest in his home terminated without due process by a police officer. *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976); *Fuentes*, 407 U.S. at 87.

**C. Chief Davis is not entitled to Qualified Immunity**

A public official can claim qualified immunity for discretionary functions so long as "their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). A two-step analysis, established by the Supreme Court in *Saucier v. Katz* requires the court to determine (i) whether Chief Davis's conduct violated plaintiff's constitutional rights and (ii) whether those rights were clearly established. 533 U.S. 194, 200-01 (2001).

Plaintiff has provided undisputed evidence that he was deprived of his Fourth and Fourteenth Amendment rights. As described above, Chief Davis caused these constitutional deprivations. As detailed above, at the time of these incidents in the summer of 2016, the law on Fourth and Fourteenth Amendment was clearly established such that a law enforcement officer could not actively participate in assisting a landlord in seizing a tenant's home and personal property and in evicting a tenant without an eviction notice, a Forcible Entry and Detainer Action under ORS Chapter 90 or a court order.

A reasonable officer would have known that this was the law and, in fact, Chief Davis did know the status of the law, and yet knowingly and affirmatively violated plaintiffs' constitutional rights. Chief Davis issued and signed the order embodying the Powers Police Department policy on landlord-tenant disputes. (Ex.9, (Powers Police Policy on Landlord/Tenant Disputes.), Bates Stamped M/D 000030 to MD 000032). This policy, issued by Chief Davis on April 21, 2009, states that "Officers of the Powers Police Department shall not lend assistance to any landlord or property manager in effecting the eviction of any tenant or guest of a tenant, but shall refer all such matters to the Coos County Sheriff's Office for resolution." *Id.* at 1. More specifically, Chief Davis' order reads, "[t]enants may not be trespassed off their property. Neither a tenant nor a tenant's guest may be removed by the police for violation of a rental agreement or other 'house rules." The only lawful method for removal of a tenant is for the landlord to use the civil eviction process and obtain a court order." *Id.* This order by Chief Davis accurately states the well-established nature of the rights that he violated in this case. Under a Section headed "Risks Involved" Chief Davis' order and policy reads, "a Police Officer who threatens or executes an arrest. . . or who assists or who encourages a landlord in excluding or removing an tenant's belongings, may risk civil liability against the officer. . . If the Landlord and Tenant Act applies then the tenant has a right to a jury trial prior to removal." *Id. at* 3.

Despite not only knowing about, but actually issuing, the policy for the City of Powers, Chief Davis violated plaintiff's well-established rights by trespassing him from his home without a court order. Qualified immunity cannot apply in these circumstances.

### III. The Unlawful Ouster Claims

Plaintiff is also entitled to summary judgment on his claim for unlawful ouster under Oregon's Residential Landlord and Tenant Act. ORS 90.375. There is no dispute that plaintiff

Page 21 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

was unlawfully ousted from the home that he was renting pursuant to a written rental agreement. There is no dispute that plaintiff was never served with a valid eviction notice and no eviction action was ever filed against him.  There is no dispute that his rental agreement was never lawfully terminated.  And, there is no dispute that plaintiff was trespassed from his home by the Police and his home was subsequently torn apart and torn to the ground by the Maffeis.

**A.  Denyce Shorb and the Maffeis were all Landlords and/or Landlord Agents.**

ORS 90.375 states in relevant part:

> If a landlord unlawfully removes or excludes the tenant from the premises, seriously attempts or seriously threatens unlawfully to remove or exclude the tenant from the premises or willfully diminishes or seriously threatens unlawfully to diminish services. . . the tenant may. . . recover up to two months' periodic rent or twice the actual damages sustained by the tenant, whichever is greater.

The term "landlord" is broadly defined at ORS 90.100(23) as "the owner, lessor or sublessor of the dwelling" including "a person who is authorized by the owner, lessor or sublessor to manage the premises."   ORS 90.100(24) also broadly defines "landlord's agent" as "a person who has oral or written authority either express or implied, to act for or on behalf of a landlord."

Denyce Shorb is a landlord because she at all relevant times owned the property at 460 Poplar.  Harvey Maffei was also a landlord because he was "authorized by the owner to manage the premises" via the August 26th written authorization from Shorb giving him permission "to tear down structures and dispose of everything in buildings and on property." Michael Maffei was a "landlord" and a "landlord's agent" because he was authorized to assist both Shorb and his brother Maffei in managing the premises.  He also had authority to act for and on behalf of both Shorb and his brother.  For example, he was authorized by Shorb to deal with the police regarding the exclusion of Angie Armstrong from the property as early as July 6, 2016.  (Ex. 1,

(Shorb Depo), 42; Ex. 8, (Notice of July 2016.)  Michael Maffei was also authorized by Shorb to tell plaintiff to leave the premises, something he did in Shorb's presence.  (Ex. 1, (Shorb Depo), 26:24-27:1; Ex. 2, (M.Maffei), Depo, 45:1-7.)  Michael Maffei admitted that he and his brother posted the legally flawed 72 hour notice on plaintiff's home on or around August 26, 2016.  (Ex. 2, (M.Maffei Depo), 42:7-24.) This is clearly a function of managing the property for the landlord, making Michael Maffei a landlord under ORS 90.100(23).  Michael Maffei obtained and annotated the sales agreement between Shorb and Harvey Maffei and acted as the seller's witness, all functions that show he was the landlord's agent.  (Ex. 11, (Sales Agreement.))  Further, Michael Maffei held himself out to plaintiff as the purchaser of the property and repeatedly threatened him with physical force if he did not leave.  (Clark Dec. ¶14.)  Finally, Michael Maffei assisted his brother Harvey in the demolition of plaintiff's home and advised him to tear it down "a piece at a time."  (Ex. 2, (M. Maffei Depo), 47:2-3; Angie Armstrong Dec.¶ 9; Ex. 6.,(Vinson Depo), 34:13-16.)

**B.  Shorb and the Maffeis Illegally Ousted Plaintiff from his Home.**

> **1.      Denyce Shorb**

Shorb admitted in deposition that she violated ORS 90.375 by calling Chief Davis to trespass plaintiff.

> Q. So you asked Officer Davis to trespass Kerry Clark?
> A. Yes.
> Q. And Officer Davis responded and asked Mr. Clark to leave.
> A. Yes.
> Q. Did you have a court order at that time?
> A. No.
> Q. Had you filed an eviction notice at that time?
> A. No.

(Ex. 1, (Shorb Depo), 20:25 – 21:9.)  Shorb then agreed to sell the property (both main and back houses) to Harvey Maffei.  A few weeks after the sales contract was signed, on August 26, 2016, she gave Harvey Maffei written "permission to tear down structures and dispose of everything in buildings and on property. (460 Poplar Street, Powers, OR)."  (Ex. 11 (Sales Agreement.))  Harvey Maffei, with his brother's help, did proceed to tear down plaintiff's home. (Ex. 2, (M. Maffei Depo), 46:17-47:20.)  Plaintiff is entitled to summary judgment against Denyce Shorb on his unlawful ouster claim.

>       2.       **Harvey Maffei**

Harvey Maffei became a landlord when Denyce Shorb agreed to sell him the property and gave him written authorization to tear down the house that plaintiff was living in. With his brother's help, he did destroy the house, despite knowing that Kerry Clark had an eviction notice that had not been lawfully terminated.  (Ex. 2, (M.Maffei Depo), 31:10-20; Armstrong Dec. ¶ 9; Ex. 5, (H. Maffei Depo), 32:4-33:24.)

>       3.       **Michael Maffei**

Michael Maffei became a "landlord" and a "landlord's agent" under ORS 90.100 when both Denyce Shorb and Harvey Maffei authorized him to act on their behalf in posting an eviction notice to plaintiff, telling plaintiff to leave and tearing down plaintiff's home. He assisted Shorb and his brother Harvey in the illegal lockout and the destruction of the property. (Clark Dec.¶16; Ex. 2 (M. Maffei Depo), 50:15-24.; Armstrong Dec at ¶ 9; Ex. 6, (Vinson Depo), 34:13-16.)   He acted on behalf of the owner Ms. Shorb in selling the property, he wrote provisions into the sales agreement and he was her witness to the sales agreement with his brother (Ex. 11 (Sales Agreement), 5.)  Michael Maffei was a landlord's agent.

It is undisputed that Denyce Shorb, Harvey Maffei and Michael Maffei all acting as landlords or landlord agents unlawfully ousted Kerry Clark from the home he was renting in violation of ORS 90.375.

**IV. Conclusion**

Plaintiff respectfully requests that this Court grant him summary judgment on his Fourth and Fourteenth Amendment claims against Chief Davis and his Unlawful Ouster claim against Defendants Shorb, Michael Maffei and Harvey Maffei.

The other claims in this matter should be set for trial.

DATED this 1st day of February, 2018.


OREGON LAW CENTER


<u>s/ William B. Niese</u>
William B. Niese


Of Attorney for Plaintiffs


Page 25 – **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**