Denyce Shorb - 6/22/2017

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


KERRY CLARK,                          )
                                      )
               Plaintiff,             )
                                      )
        v.                            ) Case No. 6:17-cv-00033-JR
                                      )
MICHAEL MAFFEI, in his                )
personal and official                )
capacities; RHETT DAVIS,             )
in his official capacity;            )
and DENYCE SHORB,                     )
                                      )
               Defendants.            )
                                      )


DEPOSITION OF DENYCE SHORB

Taken in Behalf of the Plaintiff


Thursday, June 22, 2017


Reported by:

D. Iwalani Carr, RPR, CSR

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 2

```
1              BE IT REMEMBERED THAT, pursuant to Federal

2    Rules of Civil Procedure, the deposition of DENYCE SHORB

3    was taken before D. Iwalani Carr, RPR, CSR, a

4    professional shorthand reporter certified by the State

5    of Oregon, that pursuant to ORS 44.320 said reporter is

6    empowered to administer oaths to witnesses, that the

7    above-named witness was placed under oath on Thursday,

8    June 22, 2017, commencing at the hour of 9:00 a.m., in

9    the Coos County Courthouse, in the City of Coquille,

10   County of Coos, State of Oregon.

11                        --oOo--

12                    APPEARANCES:

13

14   For the Plaintiff:        Oregon Law Center
                               By:  Edward Johnson
15                                  Bill Niese
                               522 SW 5th Avenue, Suite 812
16                             Portland, OR 97204

17   For the Defendants        Law Office of Gerald L. Warren
     Maffei and Davis:         and Associates
18                             By:  Gerald L. Warren
                               901 Capitol Street NE
19                             Salem, OR 97301

20   Also Present:             Kerry Clark
                               Michael Maffei
21                             Rhett Davis
                               Mark Williams

22

23

24

25
```

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 5

1   client will get a judgment against you.

2          So do you have any plans to appear in the

3   lawsuit or --

4       A.   I'm appearing today.

5       Q.   Okay.

6          Have you ever been deposed before?

7       A.   What's "deposed" mean?

8       Q.   So this is a deposition.  So I should back up

9   a little bit and explain what happens here.

10          So you're going to answer questions about

11   this, the incidents, under oath, and then we can use

12   those answers in later proceedings, maybe a motion or a

13   trial.

14          So do you understand that?

15      A.   Mm-hm.

16      Q.   Okay.  So have you ever been part of a lawsuit

17   before, a party to a lawsuit?

18      A.   No.

19      Q.   You've never sued anyone or no one's ever sued

20   you.

21      A.   No.

22      Q.   The other thing is, since the court reporter

23   is taking this down, it's best if we go back and forth.

24   So I ask a question and then you answer it and I wait.

25   Sort of the way normal people talk is there's a little

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 6

1    bit of back and forth in the middle of questions and

2    answers, but that doesn't work very well for the court

3    reporter.  So --

4          A.    (Witness nods head.)

5          Q.    Okay.

6                Where do you currently live?

7          A.    A physical address?

8          Q.    Yes.

9          A.    815 Avenue A, Powers, Oregon.

10         Q.    And how long have you lived there?

11         A.    Fifteen years.

12         Q.    Where did you live before that?

13         A.    Myrtle Point.

14         Q.    So you've lived in Powers at the same address

15   for the past 15 years?

16         A.    Mm-hm.

17         Q.    Did you ever own the property located at 460

18   Poplar Street?

19         A.    No.  My mom, Sylvia Jelen, owned it, and then

20   she willed it to us.

21         Q.    And who is "us"?

22         A.    Me and my brother, William Mellor.

23         Q.    So how long did your mom own the property?

24         A.    Probably twenty-plus years.

25         Q.    And how do you spell her last name?

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 8

1    Q.    And can you describe the condition of the

2    cabin when you lived there in the '90s?

3    A.    When I lived there it was in living condition.

4    And then since my mom passed away, it deteriorated

5    because there was no upkeep in the place.

6    Q.    So when you say it was in living condition,

7    did it have electricity?

8    A.    Yes.

9    Q.    Did it have running water?

10    A.    Yes.

11    Q.    Was there a bathroom in there?

12    A.    Yes.

13    Q.    Do you know if anyone lived there before you?

14    A.    No.

15    Q.    Do you know if anyone lived there after you

16    while your mom was still alive?

17    A.    No.

18    Q.    You don't know or no one did live there?

19    A.    Nobody lived there.  It was turned into a

20    storage unit.

21    Q.    And then after your brother moved into the

22    main house, did anyone live in the cabin?

23    A.    Not when he first moved into the main house.

24    It was turned into a storage unit.

25    Q.    And whose stuff was in the cabin?

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 14

1      A.   Across town.

2      Q.   So how far is across town?  Is it half a mile

3  or --

4      A.   Maybe a half a mile.

5      Q.   Did you ever take steps to remove Mr. Clark

6  from the cabin?

7      A.   I put a written 72-hour eviction notice on the

8  door.  It was taken pictures of and I had a witness.

9      Q.   Do you remember when that was?

10     A.   August 23rd, 2016.

11     Q.   And what was the reason for that 72-hour

12  notice?

13     A.   Since he moved in, he never paid.  He lived

14  there for free from June until approximately September.

15     Q.   Did he ever try to pay you rent?

16     A.   No.  He said he was going to set up an

17  account, and I didn't want an account, and he had my

18  P.O. box number that he could have sent a money order

19  to.

20     Q.   Do you know if he ever paid your brother rent?

21     A.   Nope.  But he was incarcerated, so he would

22  have never been paid.

23     Q.   And again, what was the date that your brother

24  was incarcerated?

25     A.   June 19, 2016, to April 24th of 2017.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 15

1      Q.   I'm going to show you an exhibit we'll mark as

2   Deposition Exhibit 1.

3                              (Exhibit 1 marked

4                              for identification.)

5           Do you recognize that exhibit?

6      A.   Yes, I do.

7      Q.   What is that?

8      A.   That's the rental agreement.

9      Q.   And when did you sign this rental agreement?

10     A.   I guess it was the first part of June, but it

11  was never dated.

12     Q.   And did you have anything to do with creating

13  this rental agreement?

14     A.   No.

15     Q.   How did you find out about it?

16     A.   It was just presented to me.

17     Q.   Who presented it to you?

18     A.   Kerry Clark.

19     Q.   And when he presented it to you, had it

20  already been signed by your brother?

21     A.   Yes, it was, and Kerry Clark.

22     Q.   And was Angie Armstrong present when you

23  signed it?

24     A.   No.

25     Q.   Where were you when Kerry Clark presented it

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 16

1    to you?

2        A.    In the alley next to 460-1/2 Popular Street.

3        Q.    And do you know what he said to you when he

4    showed it to you?

5        A.    No.  He just handed it to me.

6        Q.    And did you have any questions about it?

7        A.    Not really.  I didn't sign it at that time.  I

8    had taken it with me to read it.  And then Angie

9    Armstrong said that he wanted it signed so he could have

10   it.

11       Q.    And so do you remember approximately when you

12   signed it in relationship to when you first saw it?

13       A.    It was probably maybe the middle of June of

14   2016.

15       Q.    And what's your understanding of the terms of

16   the rental agreement when you signed it?

17       A.    That he was to pay 200 a month, and I never

18   got any rent.  And that's why he got the eviction

19   notice.

20       Q.    You said earlier that he tried to set up an

21   account to pay rent?

22       A.    He wanted to set up some kind of account in a

23   bank, and I didn't want that, where he could have done a

24   money order and sent to my address, and he didn't

25   attempt that.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 20

1    Mr. Clark?

2         A.   Yes, I did.

3         Q.   Do you know when that was?

4         A.   It was either the end of June, first part of

5    July.

6         Q.   And why did you call Officer Davis?

7         A.   Trying to have him removed from the property.

8         Q.   And why were you trying to have him removed

9    from the property?

10        A.   His -- in the rental agreement, it said not to

11   exceed 60 days if he hadn't paid the $200.

12        Q.   And did Officer Davis respond to your call?

13        A.   Yes.

14        Q.   What did he do?

15        A.   He assisted with me to 460-1/2 Popular where

16   Kerry Clark resided.

17        Q.   What did he do specifically?

18        A.   Who?

19        Q.   Officer Davis.

20        A.   He knocked on the door and asked him to leave.

21   And Kerry Clark said that he would leave, but his van

22   was broke down.  So I gave him an extra week to leave,

23   and then an hour later I seen him driving his van.  But

24   he was going to voluntarily leave at that point.

25        Q.   So you asked Officer Davis to trespass Kerry

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 21

1    Clark?

2         A.    Yes.

3         Q.    And Officer Davis responded and asked

4    Mr. Clark to leave.

5         A.    Yes.

6         Q.    Did you have a court order at that time?

7         A.    No.

8         Q.    Had you filed an eviction notice at that time?

9         A.    No.

10        Q.    Did Mr. Clark leave?

11        A.    No.

12        Q.    Did you have to call Officer Davis again after

13   that?

14        A.    No.

15        Q.    Do you know if Officer Davis came back to the

16   property after this initial interaction?

17        A.    I had heard that he did, but I didn't -- I

18   wasn't there personally.

19        Q.    Who did you hear from that he had been back

20   out there?

21        A.    Mr. Maffiea -- Michael.

22        Q.    Was Mr. Maffei involved in calling Officer

23   Davis the first time?

24        A.    No.

25        Q.    That was just your idea?

Denyce Shorb - 6/22/2017

Page 22

1      A.    Yes.

2      Q.    And do you know if you called his office

3   number or a cell number?

4      A.    A cell phone number.

5      Q.    And how did you have his cell phone number?

6      A.    It's on the recording that when you call the

7   city hall or the police office.

8      Q.    So you were physically present when Officer

9   Davis came out to the property?

10     A.    Yes.

11     Q.    Who else was there besides you, Mr. Clark and

12  Officer Davis?

13     A.    He had some other people inside the residence.

14     Q.    Do you know how many?

15     A.    Three.

16     Q.    And do you know who those people were?

17     A.    No.

18     Q.    Was one of them Tiffany?

19     A.    No.

20     Q.    And did Officer Davis say anything to those

21  people?

22     A.    Just that they had to leave also.

23     Q.    Did you tell Officer Davis that you had a

24  rental agreement with Mr. Clark?

25     A.    Yes.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 23

1      Q.   Did you show him that rental agreement?

2      A.   Yes.

3      Q.   Was Mr. Maffei, the next door neighbor, was he

4   present when Officer Davis came out?

5      A.   No.  It was just me and Mr. Rhett Davis.

6      Q.   Have you sold the property at 460 Poplar?

7      A.   No.

8      Q.   You still own it?

9      A.   Yes.

10     Q.   Did you enter into negotiations to sell the

11  property?

12     A.   Yes.

13     Q.   With whom?

14     A.   Harvey Maffietta, or what --

15          MR. JOHNSON:  How do you pronounce your

16  last name?

17          MR. MAFFEI:  "Maf-fay."

18          MR. JOHNSON:  Maffei.

19  BY MR. JOHNSON:  (Continuing)

20     Q.   Harvey Maffei?

21     A.   Yes.

22     Q.   And did you enter into a sales agreement with

23  Harvey Maffei?

24     A.   There was just a written agreement, a paper

25  agreement.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 26

1    had there been any damage done to the cabin?

2        A.    Yes.

3        Q.    What was the condition of the cabin on

4    August 23rd?

5        A.    The outside, it was dug up around it.  The

6    hole in the back.  All his garbage was out front.  There

7    was none of the household trash taken away of his own.

8    And there was no running water, so he had all of his

9    dirty dishes out in front.

10       Q.    So was there any damage done to the property

11   that you think had not been caused by Mr. Clark?

12       A.    No.

13       Q.    Did Mr. Clark vacate in response to this

14   notice?

15       A.    No.

16       Q.    So when did he eventually vacate?

17       A.    It was probably the first part of September.

18       Q.    And do you know why he finally left?

19       A.    No.

20       Q.    Do you know if Mr. Maffei or his brother ever

21   asked him to leave?

22       A.    Yes, because he was -- Mr. Harvey was in the

23   process of buying it at that time.

24       Q.    Did you ever witness Harvey or Michael Maffei

25   ask Mr. Clark to leave?

Carr Court Reporting
(503) 227-2277

Denyce Shorb - 6/22/2017

Page 27

1    A.   Yes.

2    Q.   When was that?

3    A.   Probably in August.

4    Q.   When did you first start negotiating with

5    Harvey Maffei to purchase the 460 Poplar?

6    A.   Maybe the first part of August of 2016.  I'm

7    not sure, exact date.

8    Q.   Had you been talking to Harvey or Michael

9    Maffei about that?

10   A.   Both.

11   Q.   And do you remember if you'd been talking to

12   them for a while before you signed a sales contract with

13   them?

14   A.   No.

15        MR. WARREN:  Object to the form of the

16   question.  She didn't say she signed a sales contract

17   with both of them.

18   BY MR. JOHNSON:  (Continuing)

19   Q.   What do you remember about either Harvey or

20   Michael Maffei asking Mr. Clark to leave?

21   A.   That he was given a eviction notice and also

22   asked by the chief of police to leave, and he never did.

23   Q.   And do you remember when -- so just to be

24   clear, did you witness a time when both Harvey and

25   Michael Maffei asked Mr. Clark to leave?

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 28

1      A.    Yes.

2      Q.    And do you remember when that was?

3      A.    No.

4      Q.    Was it after you had begun discussions to sell

5  the property to Harvey Maffei?

6      A.    Yes, and after the eviction notice.

7      Q.    So sometime after August 23rd?

8      A.    Mm-hm.

9           MR. WARREN:  Yes?

10          THE WITNESS:  Yes.

11  BY MR. JOHNSON:  (Continuing)

12     Q.    Did you ever witness Mr. Maffei or -- Michael

13  Maffei or Harvey Maffei ask Mr. Clark to leave before

14  August 23rd?

15     A.    No.

16     Q.    Did you ever talk to them about Mr. Clark

17  leaving the cabin?

18     A.    No.  I wanted him gone before anything else

19  happened.

20     Q.    Did you ever tell Mr. Clark that you couldn't

21  accept rent because you were selling the property?

22     A.    No.

23     Q.    Did Mr. Clark ever talk to you about buying

24  the property?

25     A.    Yes.

Carr Court Reporting
(503) 227-2277

Denyce Shorb - 6/22/2017

```
                                                    Page 42
 1    Officer Allen in relation to having Mr. Clark removed?

 2         A.   I -- one time for me, the first time, when he

 3    voluntarily was going to leave and he never did.  And so

 4    that's when I gave him a week extension because he said

 5    his van was broke down, and an hour later I seen it --

 6    he was driving it.

 7         Q.   Did you ever communicate with Officer Davis or

 8    Officer Allen by text or e-mail?

 9         A.   No.

10         Q.   Did you ever call Officer Allen in response to

11    having anyone removed from 460 or 460-1/2 Poplar?

12         A.   No.  This was just handed.

13              MR. WARREN:  You're pointing to

14    Exhibit 5?

15              THE WITNESS:  Exhibit 5.

16    BY MR. JOHNSON:  (Continuing)

17         Q.   It was just handed to whom?

18         A.   To Mr. Michael Maffei, because I had to work.

19         Q.   And what did you tell Mr. Maffei when you

20    handed it to him?

21         A.   I just asked him if he could hand Exhibit

22    Number 5 to Mr. Allen.

23         Q.   Do you remember when Harvey Maffei moved in --

24    Do you remember if you wrote this on July 6, 2016?

25         A.   I wrote it on July 6, 2016, and then I think
```

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 59

1     Q.   And where were you at the time you made the

2     call?

3     A.   Out front of the house.

4     Q.   Out front of 460 Poplar?

5     A.   Yes.

6     Q.   And so what specifically did you tell Chief

7     Davis?

8     A.   That I wanted Mr. Clark removed.  He hadn't

9     paid any rent and I didn't like the traffic that was

10    going in and out of there.

11    Q.   Anything else?

12    A.   And the garbage and stuff that was left around

13    there.

14    Q.   Anything else?

15    A.   No.

16    Q.   And you said neither Michael Maffei nor Harvey

17    Maffei were involved in that incident?

18    A.   No.

19    Q.   And did Chief Davis respond?

20    A.   Yes.

21    Q.   And did he come to the house at 460?

22    A.   We both met in front and walked out to 460-1/2

23    Poplar.

24    Q.   And who did you see?

25    A.   I saw Kerry Clark, and I don't know who the

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 60

1    other three people were.

2         Q.    You don't know any of them at all?

3         A.    No.

4         Q.    Whether male or female?

5         A.    Seems like there was one female and two males.

6         Q.    Do you know what they were doing?

7         A.    No.

8         Q.    Did you get any more specific in your

9    complaint to Chief Davis?

10        A.    Just that I would like him removed, and that's

11   when he voluntarily said he would leave and move out.

12        Q.    When you say "he," you're talking about

13   Mr. Clark?

14        A.    Kerry Clark.  And so that's when he said his

15   van was broke down, and then an hour later I seen him

16   driving it.

17        Q.    So tell me specifically what you and Chief

18   Davis did.

19        A.    We walked to 460-1/2.  He knocked -- Mr. Rhett

20   Davis knocked on the door and he said that he would like

21   Mr. Clark to be -- leave, or Mr. Rhett Davis was going

22   to get him for trespassing.  And that's when Kerry said

23   that he would voluntarily leave.

24        Q.    Was the chief talking to everybody in that

25   room, everybody needs to be out?

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 61

1      A.    More or less Kerry Clark and also his people

2   that were there.

3      Q.    And had you requested that they be trespassed?

4      A.    Yes.

5      Q.    And did you -- I thought you said earlier you

6   thought you showed a rental agreement to the chief.

7      A.    I did.

8      Q.    Did you have that with you at the time?

9      A.    Yes.  I carry it with me all the time.

10     Q.    So you're talking about Exhibit 1?

11     A.    Yes.

12     Q.    So you actually showed a copy of that to the

13  chief at that time?

14     A.    Yes.  I don't know if it was at that time or

15  shortly after, but it was that same period of time.

16     Q.    Are you sure it wasn't later that you showed

17  that to him?

18     A.    Not that I recall.

19     Q.    Do you remember any conversation where the

20  chief asked you if you had anything in writing and you

21  said you didn't?

22     A.    No.

23     Q.    Did you later talk to the chief about this

24  incident?

25     A.    Of the incident of removing Mr. Clark?

Carr Court Reporting
(503) 227-2277

Denyce Shorb - 6/22/2017

Page 62

1     Q.   Yes.  Getting rid of the -- asking the people

2  that were in that shed to leave.

3     A.   **I never talked to Mr. Davis after that.**

4     Q.   Did you talk to anybody else at the city about

5  it?

6     A.   No.

7     Q.   So you said that Chief Davis knocked on the

8  door --

9         He didn't kick the door in?

10    A.   No.

11    Q.   You said he knocked on the door and there was

12  a group of people inside, four people, it sounds like,

13  total?

14    A.   Yes.

15    Q.   And he asked them -- he said that Mr. Clark

16  needed to leave or something to that effect?

17    A.   Yes.

18    Q.   And then did he also say the others needed to

19  leave?

20    A.   Yes.

21    Q.   And then --

22    A.   **They were on my property.**

23    Q.   And you didn't want them there.

24    A.   No.

25    Q.   And then you said Mr. Clark volunteered to

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 72

1    Q.   And did you agree to the purchase price with

2    Harvey Maffei to sell it for this $23,200?

3    A.   Yes.

4    Q.   And then you said it -- Mr. Harvey Maffei

5    moved into the property at 460, the main house,

6    sometime, I think you said, in August, correct?

7    A.   Yes.

8    Q.   And then he later moved out and moved to

9    Kansas, you said?  Moved back to Kansas?

10   A.   Yes.  Family health.

11   Q.   Did you ever try to sell the property after

12   Harvey Maffei left?

13   A.   No.

14   Q.   Are you trying to sell it now?

15   A.   No.

16   Q.   Is it in tax foreclosure?

17   A.   Yes.

18   Q.   Did you ever provide Harvey Maffei with a copy

19   of Exhibit 1, the landlord lease agreement, lease rental

20   agreement?

21   A.   No, but I showed it to him.

22   Q.   So when did you do that?

23   A.   Shortly after he moved in.

24   Q.   Did you actually see plaintiff tearing any of

25   the property down besides the floor tile that you said

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 73

1    he tore up?

2        A.    I never seen him actually doing it, but later

3    I seen where stuff was damaged.

4        Q.    Did your mom have property that she left you

5    and your brother that was still there in the cabin and

6    in the shed or in the backyard?

7        A.    I didn't really know.

8        Q.    Did you go through your mom's property after

9    she passed away?

10       A.    No.

11       Q.    And your mom's first name is Sylvia?

12       A.    Yes.

13       Q.    Sylvia Jelen?

14       A.    Yes.

15       Q.    When did she pass away?

16       A.    Eight or nine years ago.

17       Q.    And did you take steps at that time to put the

18   property in your name and your brother's name?

19       A.    I didn't fulfill the steps of getting it in my

20   name.  It's still in my mom's name, Sylvia Jelen.

21       Q.    But you're basing your ownership upon the fact

22   that you and your brother are the only heirs to your

23   mom's estate?

24       A.    Yes.

25       Q.    Are there rat nests in the cabin?

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 74

1      A.   Not to my knowledge.

2      Q.   In the complaint it says that you had a prior

3 agreement with Michael Maffei to purchase the property

4 for $15,000.

5           Did you have any written agreement with

6 Michael Maffei to purchase the property?

7      A.   No.

8      Q.   Did you ever have an agreement with -- or did

9 Mr. Clark ever make an offer to you to buy the house and

10 the cabin for $20,000?

11      A.   Just verbally.

12      Q.   He just said he would try to get a VA loan?

13      A.   Yes.

14      Q.   When did that conversation take place?

15      A.   Maybe the first part of June.  I don't know

16 exactly the date or month.

17      Q.   Do you know if he ever took any steps to apply

18 to the VA?

19      A.   No.

20      Q.   You don't know?

21      A.   No.

22      Q.   Did he ever come back to you later and discuss

23 your agreement to purchase the property with Mr. Harvey

24 Maffei?

25      A.   No.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 75

1     Q.    Did you tell Mr. Clark that you had entered

2  into an agreement to sell the property to Harvey Maffei?

3     A.    No.

4     Q.    In the lawsuit, it says that you agreed to

5  sell the property to Mr. Clark for $20,000.

6           Did you ever agree to that?

7     A.    No.

8     Q.    What did you understand you had discussed?

9     A.    That he was going to try to get a VA loan to

10  purchase the property, but I didn't give him an answer,

11  yes or no.

12     Q.    At that time when that happened, that

13  discussion happened, was the property vacant?

14     A.    Yes.  My brother just shortly got

15  incarcerated.

16     Q.    So it was about mid-June then?

17     A.    Yes.

18     Q.    So when I said the property, the main house

19  was vacant --

20     A.    Yes.

21     Q.    -- or was Angie Armstrong still there?

22     A.    Maybe it was after she vacated it in the end

23  of June.

24     Q.    But Mr. Clark was living in the cabin.

25     A.    Yes.

Carr Court Reporting
(503) 227-2277

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 76

1      Q.    He says in the complaint, on July 7, 2016, he

2    attempted to pay rent to you.

3           Did that ever happen?

4      A.    No.   And he also had my P.O. box number to

5    send the money order.

6      Q.    I understand.

7           Says in the lawsuit, on or about July 9th

8    Officer Davis arrived at the residence unannounced with

9    you and defendant Maffei.

10          You said defendant Maffei wasn't there.

11   Michael Maffei wasn't there.

12     A.    No.   It was just me and Mr. Rhett Davis.

13     Q.    It says officer Davis threw open the front

14   door --

15     A.    No.

16     Q.    -- and entered the dwelling unit.

17     A.    No.

18     Q.    Did he ever go into the cabin at all?

19     A.    Mr. Davis?

20     Q.    Yes.

21     A.    He knocked on the door and we talked to him

22   through the door.

23     Q.    So he never went through the threshold?

24     A.    No.

25     Q.    Did Mr. Clark have a copy of this lease and

Carr Court Reporting
(503) 227-2277

Niese Dec. Ex. 1

Denyce Shorb - 6/22/2017

Page 77

1    rental agreement at the time that Chief Davis was there?

2    Did he offer to show that to the chief?

3        A.    He just said he did.  He never showed it.

4        Q.    And when was the -- after that incident with

5    Chief Davis, that interaction, when was the next time

6    you saw Mr. Clark back at the property?

7        A.    I don't -- I don't know exact date.

8        Q.    Was he still there within the next couple

9    days?  Had he returned?

10       A.    Yes.

11       Q.    And you'd given him some time, you said, to

12   get his belongings?

13       A.    I gave him a week after the incident with

14   Mr. Davis and I there, but he said his van had broken

15   down.

16       Q.    I understand that.

17       A.    Mm-hm.

18       Q.    Did you go back, then, and check to see if he

19   ever moved out after that week?

20       A.    Yes.

21       Q.    And what was the result?

22       A.    His van was there and he was still there.

23       Q.    Did you talk to him then?

24       A.    No.

25       Q.    And so the time frame would have been about

Niese Dec., Ex. 1

Denyce Shorb - 6/22/2017

Page 78

1   the middle of July, about that time?

2       A.   Yeah.  Yes.

3       Q.   So why didn't you post an eviction notice at

4   that point?

5       A.   I just gave him more time.

6       Q.   Did you tell him he had more time?

7       A.   No.

8       Q.   Did you ever go back to that cabin and check

9   the doors to see if they were locked and anybody was

10  there when Mr. Clark wasn't there?

11      A.   No.

12      Q.   So in mid-July, do you --

13           Well, first of all, does the cabin have a lock

14  on it?

15      A.   Now?

16      Q.   No.  At the time.

17      A.   I could see a padlock from the main house

18  kitchen window.

19      Q.   So a padlock on the outside of the door?

20      A.   Yes.

21      Q.   Do you know who put the padlock on there?

22      A.   Mr. Clark.

23      Q.   Was there ever a padlock on there prior to him

24  moving in, in May 2016?

25      A.   Yes.

Niese Dec. Ex. 1

Denyce Shorb - 6/22/2017

Page 94

1                    CERTIFICATE

2

3

4          I, D. Iwalani Carr, a certified Shorthand

5    Reporter for Oregon, hereby certify that, pursuant to

6    Federal Rules of Civil Procedure, DENYCE SHORB

7    personally appeared before me at the time and place set

8    forth in the caption hereof; that at said time and place

9    I reported in Stenotype all testimony adduced and other

10   oral proceedings had in the foregoing matter; that

11   thereafter my notes were reduced to typewriting under my

12   direction, and that the foregoing transcript, pages 1 to

13   93, both inclusive, constitutes a full, true and

14   accurate record of all such testimony adduced and oral

15   proceedings had, and of the whole thereof.

16

17

18          Witness my hand and CSR seal at Portland,

19   Oregon, this 19th day of July, 2017.

20

21

22

23          _____

24          D. Iwalani Carr
            Certified Shorthand Reporter
            Certificate No. 90-0220
25          License expires 9/30/19

Carr Court Reporting
(503) 227-2277